UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Schlage Lock Company LLC, | Case No. 1:14-cv-82 |
| Plaintiff, | |
| vs. | |
| United Steelworkers AFL-CIO, Local No. 7697, | |
| Defendant. | |

**ORDER**

Plaintiff, Schlage Lock Company ("Schlage") filed this lawsuit seeking to vacate an arbitration award in favor of Defendant, United Steelworkers AFL-CIO, Local 7697 ("Union"). The arbitration grew out of the termination of two Schlage employees, Saal and Smith, who were involved in a physical altercation at work. Both employees were terminated for violating Schlage's work rules. The Union sought arbitration over Saal's discharge; Saal is Caucasian. It did not seek arbitration on behalf of Smith, an African-American employee. After a hearing, the arbitrator ordered that Saal be returned to work but without back pay or restoration of seniority.

Schlage's complaint alleges that the award should be vacated because the arbitrator exceeded his authority in ordering Saal's reinstatement without back pay, and because the award violates public policy. (Doc. 1)  The parties have submitted cross-motions seeking entry of judgment on the arbitration record. (Docs. 24 and 25)  For the following reasons, the Court will grant the Union's motion and will deny Schlage's motion.

**Background**

The relevant facts established by the record are that Saal worked for Schlage (and its predecessor, Steelcraft Manufacturing) for approximately 16 years. Smith worked at the plant for about 7 years. Saal and Smith were apparently on friendly terms, and had spoken to each other earlier the day of the incident (May 31, 2012). Saal had agreed to take Smith after work to pick up some furniture using Saal's truck.

Just before noon that day, Saal was walking by Smith's work area; their stories about what happened next were quite different. Saal claimed that Smith suddenly turned and punched him in the mouth for no reason whatsoever. Saal denied touching or saying anything to Smith, and could not explain why Smith would punch him with no reason. Smith claimed that Saal "grabbed his ass," and Smith turned around and hit Saal. Smith said that two or three months earlier, he had complained to his team leader about Saal's harassment. Schlage's investigator (Carl Parson) interviewed Smith's team leader after the incident; he denied receiving any previous complaint from Smith. Parson interviewed eleven other employees who were in the vicinity at the time of the incident. Many of them said that horseplay and behavior they called "ass-grabbing," "dry humping," making suggestive comments about "cute mouths" and about employees' mothers, were relatively common in the plant. None of the employees had seen Saal touch Smith that day. And most of them, including Saal, told Parsons that it was out of character for Smith to punch someone for no reason. (Doc. 21-2, Arbitration Exhibit 1)

Saal was suspended the same day for violation of "Serious Conduct [Rules] #2/6." (Doc. 21-2 at 34) On June 6, 2012, Schlage terminated Saal's employment,

sending him a letter that cited his violation of Serious Conduct Rule #6: "Engaging in harassment (Sexual, Racial or any other reason) of other employees or the general public while on Company premises or Company business."  (Doc. 21-2 at 35)

Article 12 of the collective bargaining agreement between Schlage and the Union describes the progressive grievance system, which culminates in submission of an unresolved grievance to binding arbitration by a mutually agreeable arbitrator.  Section 5 of that Article states: "The arbitrator shall have no power to add to, subtract from or modify any of the terms of this Agreement."  (Doc. 21-2 at 19)  The parties agreed on an arbitrator, and on a written statement of the issue being submitted for arbitration: "Did the Company have just cause when they discharged Jeremiah Saal under 'Serious Rules of Conduct' #2 and #6.  Horseplay and Harassment; and if not, what is the remedy?"  (Doc. 21-5, Arbitrator's Decision at 2)

The arbitrator conducted a hearing on July 11, 2013, at which Smith, Saal, Parson, and Terry Mullins (the Union's President) testified.  Exhibits and post-hearing briefs were submitted by both parties.  The arbitrator's written decision reviewed the evidence and the testimony, and summarized the parties' contentions.  He ultimately concluded that the grievance

> ... must be sustained to a very limited extent.  The basis for this finding is that the Company proved that the Grievant did something wrong that day, but it could not prove that he provoked Smith sufficiently that being punched in the face was a reasonable response.  However, because of the Grievant's lack of cooperation and veracity, nothing other than a return to work order is merited.

(Doc. 21-5 at 13)

Specifically, the arbitrator found that Schlage's Work Rules were not mutually

-3-

negotiated and should not be treated as binding to the same extent as the terms of the CBA.  While the Union conceded that the rules had been posted for some time and they had not filed a grievance about them, the rules were not bilateral.  The arbitrator stated that he had the power to enforce the CBA, which controlled the Rules and their enforcement in appropriate circumstances.

Regarding just cause for Saal's termination, the arbitrator found Saal's testimony was

> ... absolutely devoid of any explanation of why he might have been punched.  This violates all notions of common sense and experience.  When compared, the testimony of Smith provides the most reliable explanation of what occurred.  Thus, it must be found that the Company proved the vast portion of its factual case.
>
> That however does not prove that just cause exists for the Grievant's discharge.  While Smith proved that punching the Grievant was due to being verbally harassed as part of horseplay, culminating in an ass-grab that he did not want to be part of, that does not prove that the Grievant was acting unreasonably from the Grievant's perspective.  As proven by Smith, the type of horseplay that the Grievant engaged in with him was common.  The Grievant should have known better, but when his actions are acceptable one minute, and then the next he must consider the sensibilities of Smith, it follows that the Grievant may not have understood how seriously Smith considered being grabbed in the buttocks.  In a vacuum, the Grievant's actions are ridiculously inappropriate.  However, it is fair to consider the environment that existed when the Grievant did this, and to consider that from the Grievant's perspective it was Smith who was the outlier.

(Id. at 14-15)  The arbitrator concluded that if Smith had not punched Saal, but instead had reported Saal's conduct, "... it is doubtful that anything more than a verbal warning would have been issued" to Saal.  (Id. at 15)   However, the arbitrator also found that Saal's lack of cooperation after the incident made Schlage's investigation into the facts more difficult: "This is not the actions of a trustworthy employee, and it is something that

must be accounted for in the final adjustment that should be made [sic]." He found that a serious warning would be a "fair outcome," given all of the circumstances surrounding the incident, the atmosphere at the plant, and Saal's seniority. The arbitrator ultimately ordered that Saal be reinstated with no award of back pay, lost seniority, or expense reimbursement. (Id. at 16)

**The Parties' Contentions**

Schlage contends that the arbitrator did not construe the CBA when he awarded what Schlage calls "the unprecedented remedy of an unpaid suspension with reinstatement following Serious conduct Work Rules violations." (Doc. 24 at 14) Schlage argues that in doing so, the arbitrator exceeded his authority. According to Schlage, the parties agreed that the only question for the arbitrator was whether Schlage had "just cause" to discharge Saal, an issue limited to whether or not Saal's behavior actually occurred. The Union argued at arbitration that Saal did not violate the Work Rules, and just cause therefore did not exist. But the arbitrator went beyond determining what Saal did: he considered whether or not Saal violated the work rules, and then fashioned what he believed was an appropriate penalty.

Schlage also contends that the arbitration award violates public policy against sexual harassment, as it could leave the company exposed to charges from other potential future victims that it "tolerated" a known harasser. It also suggests that the order violates public policy banning racial discrimination. Two employees, one African-American and one Caucasian, both violated Serious Conduct Work Rules and both were discharged, yet only the Caucasian employee was reinstated.

In seeking to affirm the arbitration award, the Union cites the narrow standards

that apply to judicial review of an arbitration award. As long as the arbitrator even arguably applies the contract, serious errors or disagreement with the merits of the decision do not permit the court to set aside an arbitrator's decision. The Union contends that the arbitrator did not exceed his authority. The issue submitted by agreement was not merely whether just cause existed for Saal's discharge; the issue was whether there was just cause and if not, "what is the remedy?" Schlage's Serious Conduct Work Rules do not mandate immediate discharge for any first violation. Rather, the rules state: "Serious conduct, which **ordinarily justifies** discharge for the first offense, includes but [is] not limited to the following examples ..." (emphasis added). The examples include fighting or acts of physical violence; unsafe "horseplay and/or practical jokes ... which might endanger the safety or lives of others;" possession of firearms; using or possessing drugs or alcohol at work; harassment; insubordination; falsification of documents; stealing company property; and leaving work without clocking out. Schlage does not contend that any employee who engages in any of this conduct is automatically fired, without any consideration of the facts of the incident.

      The Union further contends that the arbitration award does not violate public policy against sexual harassment or racial discrimination. In order to fall within this narrow exception, the award itself must violate some clearly articulated public policy, and not the conduct that gives rise to an arbitration proceeding. An order reinstating an employee who engaged in the type of "horseplay" that was common at the plant does not violate any clearly established policy. And Smith's discharge was not before the arbitrator. His decision to reinstate Saal cannot be reasonably understood to condone racial discrimination.

**Standard of Review**

The Federal Arbitration Act restricts a district court's review of an arbitration award. The Court's task is to determine whether the arbitrator's decision "draws its essence from the contract." Michigan Family Res., Inc. v. SEIU Local 517M, 475 F.3d 746, 752 (6th Cir. 2007). If the arbitrator was "even arguably construing or applying the contract," the award must be confirmed. Id. "Only when the arbitrator strays from interpretation and application . . . does he enter the forbidden world of effectively dispensing his own brand of industrial justice, making the arbitrator's decision unenforceable." Id. (quoting in part Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001)) (internal brackets and quotation marks omitted). The Sixth Circuit has further explained:

> The [Supreme] Court's repeated insistence that the federal courts must tolerate "serious" arbitral errors suggests that judicial consideration of the merits of a dispute is the rare exception, not the rule. At the same time, we cannot ignore the specter that an arbitration decision could be so ignorant of the contract's plain language as to make implausible any contention that the arbitrator was construing the contract. An interpretation of a contract thus could be so untethered to the terms of the agreement . . . that it would cast doubt on whether the arbitrator indeed was engaged in interpretation. Such an exception of course is reserved for the rare case. For in most cases, it will suffice to enforce the award that the arbitrator appeared to be engaged in interpretation, and if there is doubt we will presume that the arbitrator was doing just that.
>
> . . .
>
> This view of the "arguably construing" inquiry no doubt will permit only the most egregious awards to be vacated. But it is a view that respects the parties' decision to hire their own judge to resolve their disputes, a view that respects the finality clause in most arbitration agreements . . . and a view

> whose imperfections can be remedied by selecting better arbitrators.

Id. at 753-54 (internal citations, brackets and quotation marks omitted). Thus, the reviewing court cannot vacate an arbitrator's award even if he made "serious, improvident, or silly errors in resolving the merits of the dispute." Id. at 753 (internal quotation marks omitted). Nor may the reviewing court reverse the arbitrator's decision based on mistakes of fact or law, Beacon Journal Pub. Co. v. Akron Newspaper Guild Local No. 7, 114 F.3d 596, 599 (6th Cir. 1997), or a misinterpretation of federal law. Anaconda Co. v. District Lodge No. 27 of the Int'l Ass'n of Machinists, 693 F.2d 35, 37-38 (6th Cir. 1982).

One narrow exception arises if the arbitrator's interpretation of a collective bargaining agreement violates public policy. Board of County Comm'rs of Lawrence County v. L. Robert Kimball & Assoc., 860 F.2d 683, 686 (6th Cir. 1988). A federal court may overturn an arbitrator's contract interpretation on public policy grounds only in "... situations where the contract as interpreted would violate 'some explicit public policy' that is 'well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" Id. (quoting United Paperworkers Int'l Union v. Misco, 484 U.S. 29, 43 (1987)). Moreover, the court's review of an award challenged on public policy grounds is not de novo: "[W]hen an arbitration award is challenged on public policy grounds, the court must determine whether the arbitrator's interpretation of the contract jeopardizes a well-defined and dominant public policy, **taking the facts as found by the arbitrator**." Id. (emphasis added).

**Discussion**

The Court concludes that the arbitrator did not exceed his authority in ordering Saal's reinstatement without back pay or restoration of seniority.  In arguing for the opposite conclusion, Schlage repeatedly asserts that the "only issue" submitted to the arbitrator was whether there was "just cause" for Saal's discharge.  But the written stipulation between Schlage and the Union of the issue being submitted to the arbitrator was not limited to whether just cause existed.  The parties plainly authorized the arbitrator to address the "remedy" if he concluded that just cause was lacking.  The arbitrator framed the question presented to him as having two components: the question of fact [what happened], and the question of just cause [did what happened amount to just cause for discharge].  This framework does not exceed the authority granted by both parties in their stipulated statement of the issue they presented for arbitration.

Schlage also asserts that the Union never challenged the Work Rules, which have been in place for many years.  Since their validity is undisputed, Schlage contends that the arbitrator should have limited his decision to whether Saal violated the rules.  And once the arbitrator concluded that he did, that should have been the end of the matter.  Article 14 of the CBA provides that Schlage has the exclusive right to maintain discipline and to establish reasonable rules governing employees' conduct.  Schlage argues that the arbitrator ignored this provision, and instead overstepped his authority in reinstating Saal despite his rule violations.  But these arguments again ignore the express terms of the stipulated statement of the issue presented to the arbitrator: did Schlage have "just cause" to discharge Saal, and "if not what is the remedy?"  The arbitrator criticized Saal's behavior, calling it "ridiculously inappropriate" and finding that

Saal "should have known better." But he did not find that Saal had engaged in sexual harassment. He described the incident "as part of horseplay, culminating in an ass-grab ...", the type of horseplay that was common at the plant. In considering whether this amounted to just cause, the arbitrator did not exceed his authority in considering Saal's conduct in light of the workplace atmosphere. This is especially true in view of the fact that the Serious Conduct Work Rules do **not** mandate immediate discharge for any and all first-time violators. The Rules state that serious misconduct "ordinarily justifies" discharge, phrasing that readily supports a conclusion that some incidents will not justify discharge, but will result in some lesser discipline or penalty.

The CBA between the parties does not define "just cause." Article 13, Section 2 states that when an employee is suspended or discharged, "in his or her opinion unjustly," the employee has the right to file a grievance. Article 14, Section 1 recognizes Schlage's right to hire, discharge or discipline employees "for proper cause," and the right to maintain discipline including posting "reasonable rules and regulations governing the conduct of employees...". The arbitrator was arguably applying and interpreting these contractual provisions in light of Schlage's more specific work rules, to decide whether Saal was discharged for "proper cause" or "unjustly," and to determine the remedy if he found proper cause lacking.

Numerous decisions affirming arbitration awards arising from employee discharges illustrate that the arbitrator did not exceed his authority in determining just cause and fashioning an appropriate remedy. In Way Bakery v. Truck Drivers Local No. 164, 363 F.3d 590 (6th Cir. 2004), the Sixth Circuit found that an arbitration award reducing an employee's discharge to a six-month unpaid suspension did not exceed the

arbitrator's authority. The employee was fired for making a racially offensive remark to an African-American co-worker, violating the company's EEO policy. That policy and the CBA included progressive discipline provisions, and the EEO policy itself stated that discipline could be "up to and including" discharge. Id. at 593. The Sixth Circuit found that the arbitrator did not exceed his authority because the EEO policy did not preclude discipline less severe than termination, and arbitrators are within their authority to review and modify penalties when such language is at issue.

A similar result was reached in Vrable IV, Inc. v. SEIU District 1199, 784 F.Supp.2d 846 (S.D. Ohio 2011), where a nursing home challenged an arbitrator's decision to reinstate a nursing assistant who was discharged for what the nursing home found to be "willful and wanton" abuse of two residents. The arbitrator found that the home lacked just cause to discharge her because she did not willfully abuse the residents. There, as here, the CBA did not define "just cause." The district court rejected the employer's contention that the arbitrator exceeded his authority, finding no evidence that the decision was "so untethered from the agreement that it casts doubt on whether he was engaged in interpretation, as opposed to the implementation of his own brand of industrial justice." Id. at 851 (internal citation omitted). It also rejected the argument that the arbitrator gave more credence to hearing testimony rather than the contemporaneous investigation of the residents' complaints. The parties agreed to submit such disputes to arbitration, thereby also agreeing to the arbitrator's weighing of evidence and resolving factual disputes.

Here, the Court concludes that the arbitrator did not exceed his authority by finding that just cause for Saal's termination was lacking, and by ordering his

reinstatement without back pay.  The CBA does not define just cause or "proper cause," and the arbitrator has the authority to interpret that phrase in resolving grievances that the parties agreed to submit to binding arbitration.

This Court also concludes that the arbitrator's decision to reinstate Saal does not violate any well-established public policy.  As the case law makes clear, the issue is not whether the employee engaged in behavior that is condemned by public policy.  The issue is whether the arbitrator's decision, or his interpretation of the contract, violates any well-established public policy.  Schlage argues that the award runs afoul of laws and public policies that prohibit sexual harassment.  A similar argument to that raised by Schlage was rejected by the district court in Vrable IV, Inc., discussed above.  There, as here, the CBA limited the arbitrator's authority to the "application and interpretation" of the CBA, which did not define "just cause."  The arbitrator concluded that the facts relied on by the employer to discharge the nurse were largely true: the nurse failed to connect a resident's portable oxygen tank when walking her down the hall for a shower, and she told another resident not to push his call button again.  The nursing home argued that an order reinstating an employee who abused residents violated public policy, citing a state statute and federal regulations broadly protecting residents from all forms of abuse.  The district court agreed that willful abuse of nursing home residents would violate established public policy.  But the arbitrator found no evidence that the employee engaged in **willful** abuse.  And the question before the court was whether the reinstatement order based on that finding violated public policy.  The court concluded that it did not, because "... the Arbitrator's decision requiring Grievant's reinstatement does no more than place her back at the Center under the supervision of its

management. ... Grievant does not fall within the federal regulation prohibiting employment of individuals found guilty of abuse by a court of law or entered into the state nurse-aid registry for abuse of residents." Id. at 854.

In Way Bakery, discussed above, the Sixth Circuit considered whether an employee's reinstatement (subject to a period of unpaid suspension) violated public policy prohibiting racial harassment. A white employee made a racially derogatory remark to a black coworker; he was suspended and terminated based on his violation of the employer's EEO policy. An arbitrator reduced the discharge to six months unpaid suspension and five years of probation. The employer argued that reinstatement thwarted its efforts to comply with Title VII, and could set a precedent for other incidents. The court disagreed, noting that the employee had no prior disciplinary record, and that the arbitrator did not condone the conduct underlying his discharge. The arbitrator subjected the employee to six months lost pay, and placed him on probation for five years with a warning that a repeat incident would result in immediate discharge. Id. at 595-596. The court found no case law suggesting that public policy flatly prohibits the reinstatement of an employee who makes a racially offensive remark to a coworker.

Similarly, in Interstate Brands Corp. v. Chauffeurs, 909 F.2d 885 (6th Cir. 1990), the Sixth Circuit rejected a public policy challenge to an arbitrator's reinstatement order for a truck driver who was arrested on his day off on drug charges. He was suspended indefinitely, and filed a grievance. An arbitrator found that the driver had used drugs, but that the company had no specific guidelines or policies about policing or punishing off-duty activities. The arbitrator ordered reinstatement with back pay and benefits. The

district court vacated the arbitration award, citing state laws outlawing driving under the influence and dealing in illegal drugs.  The Sixth Circuit reversed the district court's order, finding that the proper issue was not whether the employee's conduct violated law or policy, but whether the arbitration award did so.  The court of appeals found that no established and well-defined public policy required discharge for an employee who is intoxicated or arrested for possession of drugs while off-duty.

These cases fully support the Union's contention that the arbitration award in this case did not violate any clearly established public policy. Schlage suggests that the arbitrator ignored the seriousness of Saal's behavior, which if it had been directed at a woman would clearly be considered sexual harassment.  Whether or that would be the case, the arbitrator did not condone Saal's behavior.  The arbitrator found that horseplay, "ass grabbing," and references to employees' mothers were common at the plant.  Saal "should have known better" than to engage in such conduct; but the arbitrator specifically found that Saal may not have understood that Smith considered such conduct to be so extremely offensive that Saal should have expected Smith to react in the fashion that he did.  Saal had no prior discipline, and it was Smith that escalated the situation when he punched Saal (seriously enough that Saal was taken to a local emergency room).  The arbitrator further concluded that "but for" Smith's punch, Saal would not have been discharged for violating the work rules.

The Supreme Court has cautioned that the public policy exception is a narrow one, and cannot be based upon "general considerations of supposed public interests." United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 44 (1987) (internal citation omitted).  Applying that narrow exception here, the Court concludes that the arbitrator's

-14-

decision does not violate a clearly established public policy.

## CONCLUSION

For all of the foregoing reasons, the Court finds that the November 4, 2013 Opinion and Award by Arbitrator Michael Paolucci (Doc. 21-5) should be affirmed.

The Union's motion for summary judgment affirming that order (Doc. 25) is granted.  Schlage's motion to vacate that award (Doc. 24) is denied.  Schlage's complaint is dismissed with prejudice.

SO ORDERED.

THIS CASE IS CLOSED.

DATED: December 8, 2014                                s/Sandra S. Beckwith
                                                       Sandra S. Beckwith, Senior Judge
                                                       United States District Court